June 29, 2024

Re: In re Purdue Pharma L.P., et al., Case No. 24-cv-2958(NSR)

Hon. Nelson S. Romàn

United States District Judge

500 Pearl Street

New York, NY 10007

### Letter from Amanda Morales

Due to an email from the debtors yesterday I want to make it clear that my motion was at the post offices possession April 10, 2024 the were confused and I want to make sure the court isn't confused either. Also even though the supreme Court stated in their decision they are still insistent they can't and won't agree to a resolution. Their email stated

"$40 trillion in damages based on various theories, including wrongful death due to failure to warn about the risks of opioid use.  In other words, many of those claimants are similarly situated to yourself..

Simply put, the Bankruptcy Code still prohibits us from resolving the merits of your claim before other claims.

> "a notice of appeal must be *filed with the bankruptcy clerk* within 14 days after entry of the judgment, order, or decree being appealed."  A notice of appeal is "filed" with the bankruptcy clerk when it is actually delivered to and stamped as filed by the clerk, not when it is mailed.  See *In re Soundview Elite Ltd.*, 512 B.R. 155, 157 n.2 (S.D.N.Y. 2014) *aff'd*, 597 F. App'x 663 (2d Cir. 2015) (A [document] is 'filed' when it is delivered into the 'actual custody' of the Clerk, not when it is mailed ... [and a] filing is presumed to be made on the date file-stamped by the Clerk.").  As the screenshot you included in your June 30 email and the "service" document demonstrates, your notice of appeal was delivered to the post office in White Plains on April 12, 2024, and that is also the "file" date that was stamped on the notice of appeal by the clerk.  Accordingly, as the Debtors indicated in their June 13, 2024 pre-motion letter to Judge Román, your appeal is untimely."

**The whole case has focused on the opioid crisis and addiction or else the majority of creditors getting the money wouldn't be the states. They never once discussed the failure to warn about interactions as a risk until I brought up the issue with the court. They have no intention of following the supreme courts decision and still want to argue that my due process rights be rightfully violated. I was trying to be nice and**

**considerate willing to reach a resolution but they aren't and I litigation is my only option so I no longer wish to try to compromise with them.**

## Rule 29. Filing and Service of Documents; Special Notifications; Corporate Disclosure Statement

- 1. Any document required or permitted to be presented to the Court or to a Justice shall be filed with the Clerk in paper form.
- 2. A document is timely filed if it is received by the Clerk in paper form within the time specified for filing; or if it is sent to the Clerk through the United States Postal Service by first-class mail (including express or priority mail), postage prepaid, and bears a postmark, other than a commercial postage meter label, showing that the document was mailed on or before the last day for filing; or if it is delivered on or before the last day for filing to a third-party commercial carrier for delivery to the Clerk within 3 calendar days. If submitted by an inmate confined in an institution, a document is timely filed if it is deposited in the institution's internal mail system on or before the last day for filing and is accompanied by a notarized statement or declaration in compliance with [28 U. S. C. §1746](28 U. S. C. §1746) setting out the date of deposit and stating that first-class postage has been prepaid. If the postmark is missing! or not legible, or if the third-party commercial carrier does not provide the date the document was received by the carrier, the Clerk will require the person who sent the document to submit a notarized statement or declaration in compliance with [28 U. S. C. §1746](28 U. S. C. §1746) setting out the details of the filing and stating that the filing took place on a particular date within the permitted time

**Tracking Number:**

# EI178234496US

 Copy    Add to Informed Delivery

**Scheduled Delivery by**

**THURSDAY**
**11** April 2024 ⓘ    by **6:00pm** ⓘ

Your item was delivered in or at the mailbox at 11:33 am on April 12, 2024 in WHITE PLAINS, NY 10601. Waiver of signature was exercised at time of delivery.

**Get More Out of USPS Tracking:**
📖 USPS Tracking Plus®

---

● **Delivered**
**Delivered, In/At Mailbox**
WHITE PLAINS, NY 10601
April 12, 2024, 11:33 am

● **Out for Delivery**
WHITE PLAINS, NY 10601
April 12, 2024, 6:23 am

● **Arrived at Post Office**
WHITE PLAINS, NY 10606
April 12, 2024, 6:12 am

● **Arrived at USPS Regional Destination Facility**
WHITE PLAINS NY DISTRIBUTION CEN
April 11, 2024, 5:58 pm

● **Departed USPS Facility**
ALBUQUERQUE, NM 87101
April 10, 2024, 7:28 pm

● **Arrived at USPS Origin Facility**
ALBUQUERQUE, NM 87101
April 10, 2024, 6:07 pm

● **Departed Post Office**
BERNALILLO, NM 87004
April 10, 2024, 5:02 pm

● **USPS in possession of item**
BERNALILLO, NM 87004
April 10, 2024, 1:23 pm

● Hide Tracking History

What Do USPS Tracking Statuses Mean?

SUPREME COURT Decision quotes from decision

"And, ordinarily, it does not include claims based on "fraud" or those alleging "willful and malicious injury." §§523(a)(2), (4), (6).  The Sackler discharge defies these limitations.  The Sacklers have not filed for bankruptcy, nor have they placed virtually all their assets on the table for distribution to creditors.  Yet, they seek an order discharging a broad sweep of present and future claims against them, including ones for fraud and willful injury.  In all of these ways, the Sacklers seek to pay less than the code ordinarily requires and receive more than it normally permits.  Contrary to the dissent's suggestion, plan proponents cannot evade these limitations simply by rebranding their discharge a "release."  Pp. 13–16."

"b) In the end, the plan proponents default to policy.  The Sacklers, they say, will not return any funds to Purdue's estate unless the bank- ruptcy court grants them the sweeping nonconsensual release and in- junction they seek.  Without the Sackler discharge, they predict, vic- tims will be left without any means of recovery.  But the U. S. Trustee disagrees.  As he tells it, the potentially massive liability the Sacklers face may induce them to negotiate for consensual releases on terms more favorable to all the claimants.  In addition, the Trustee warns, a ruling for the Sacklers would provide a roadmap for tortfeasors to mis- use the bankruptcy system in future cases.  While both sides may have their points, this Court is the wrong audience for such policy disputes. Our only proper task is to interpret and apply the law; and nothing in present law authorizes the Sackler discharge.  Pp. 17–19."

This understanding of the statute faces an immediate ob- stacle.  Paragraph (6) is a catchall phrase tacked on at the end of a long and detailed list of specific directions.  When faced with a catchall phrase like that, courts do not neces- sarily afford it the broadest possible construction it can bear.  Epic Systems Corp. v. Lewis, 584 U. S. 497, 512 (2018).  Instead, we generally appreciate that the catchall must be interpreted in light of its surrounding context and read to "embrace only objects similar in nature" to the spe- cific examples preceding it. Ibid. (internal quotation marks omitted).  So, for example, when a statute sets out a list discussing "cars, trucks, motorcycles, or any other vehicles," we appreciate that the catchall phrase may reach similar landbound vehicles (perhaps including buses and camper vans), but it does not reach dissimilar "vehicles" (such as airplanes and submarines).  See McBoyle v. United States, 283 U. S. 25, 26–27 (1931).  This ancient interpretive prin- ciple, sometimes called the ejusdem generis canon, seeks to afford a statute the scope a reasonable reader would attrib- ute to it.

Viewed with that much in mind, we do not think para- graph (6) affords a bankruptcy court the authority the plan proponents suppose.  In some circumstances, it may be dif- ficult to discern what a statute's specific listed items share in common.  See A. Scalia & B. Garner, Reading Law 207–

"Rather than seek to resolve claims that substantively belong to Purdue, it seeks to extinguish claims against the Sacklers that belong to their victims.  And precisely nothing in §1123(b) suggests those claims can be bargained away with- out the consent of those affected, as if the claims were some- how Purdue's own property.3"

"To win a discharge, again as we have seen, the code generally re- quires the debtor to come forward with virtually all its as- sets.  §§541(a)(1), 548.  Nor is the discharge a debtor re- ceives unbounded. It does not reach claims based on "fraud" or those alleging "willful and malicious injury."  §§523(a)(2), (4), (6).  And it cannot "affect any right to trial by jury" a creditor may have "with regard to a personal injury or wrongful death tort claim."  28 U. S. C. §1411(a).  The plan proponents and the dissent's reading of §1123(b)(6) trans- gresses all these limits too.  The Sacklers have not agreed to place anything approaching their full assets on the table for opioid victims. Yet they seek a judicial order that would extinguish virtually all claims against them for fraud, will- ful injury, and even wrongful death, all without the consent of those who have brought and seek to bring such claims. In each of these ways, the Sacklers seek to pay less than the code ordinarily requires and receive more than it normally permits.

Finally, there is a notable exception to the code's general rules.  For asbestos-related bankruptcies—and only for such bankruptcies—Congress has provided that, "[n]ot- withstanding" the usual rule that a debtor's discharge does not affect the liabilities of others on that same debt, §524(e), courts may issue "an injunction . . . bar[ring] any action di- rected against a third party" under certain statutorily spec- ified circumstances. §524(g)(4)(A)(ii).  That the code does authorize courts to enjoin claims against third parties with- out their consent, but does so in only one context, makes it all the more unlikely that §1123(b)(6) is best read to afford courts that same authority in every context.  See, e.g., Bittner v. United States, 598 U. S. 85, 94 (2023); AMG Cap- ital Management, LLC v. FTC, 593 U. S. 67, 77 (2021).5

How do the plan proponents and the dissent reply to all this? Essentially, they ask us to look the other way. What- ever limits the code imposes on debtors and discharges mean nothing, they say, because the Sacklers seek a "re- lease," not a "discharge." See, e.g., post, at 46–48. But word  games cannot obscure the underlying reality.  Once more, the Sacklers

seek greater relief than a bankruptcy dis- charge normally affords, for they hope to extinguish even claims for wrongful death and fraud, and they seek to do so without putting anything close to all their assets on the ta- ble.  Nor is what the Sacklers seek a traditional release, for they hope to have a court extinguish claims of opioid victims without their consent.  See, e.g., J. Macey, Corporate Gov- ernance: Promises Kept, Promises Broken 152 (2008) ("set- tlements are, by definition, consensual"); accord, Firefight- ers v. Cleveland, 478 U. S. 501, 529 (1986). "

"No one has directed us to a statute or case suggesting American courts in the past enjoyed the power in bankruptcy to discharge claims brought by nondebtors against other nondebtors, all with- out the consent of those affected."

Because the Second Circuit ruled otherwise, its judgement is reversed and the case is remanded for further proceedings consistent with this opinion."

Amanda Morales

(505) 318-2400

205 Calle Del Banco

 Bernalillo, NM 87004

*Amanda Morales* (signature)